FIDELITY-PHENIX INS. Co. *v.* Paula LYNCH

5-5280                                    455 S. W. 2d 79

Opinion delivered June 8, 1970

*Wright, Lindsey & Jennings,* for appellant.

*Gordon, Gordon & Eddy,* for appellee.

Lyle Brown, Justice. Appellee Paula Lynch was the plaintiff below and recovered judgment as the result of a fall down the stairway in St. Anthony's Hospital in Morrilton. The judgment was against Fidelity-Phenix Insurance Company, which covered the charitable hospital with public liability insurance. Fidelity-Phenix

moved for a directed verdict at the close of plaintiff's case in chief on the ground that while the proof showed the landing at the top of the stairway was not built according to regulations, that construction was not shown to have been a proximate cause of Mrs. Lynch's fall. The motion, which was overruled, was renewed without success at the close of Fidelity-Phenix's case. The propriety of those rulings is the only question on appeal.

Evidence introduced by appellee reflected that Mr. and Mrs. Lynch visited a sick friend on the second floor; that they left the hospital by the same route they entered, using a flight of stairs; and that appellee fell down the stairs after passing through a door which opened onto the stairs. As the couple started down the steps they were headed south, and the door was hinged to their right. Naturally the door had to be by them pushed forward and out over the stairs. There was no landing on the stairs side, or south side, of the door. As one stepped through the door, instead of stepping on a landing the same level as the- floor on the north side of the -door, he stepped down to the first step of the stairway. The riser of the first step was flush with the door opening. The described construction was in violation of state health department regulations which required the floor level of the corridor of the second floor to be maintained on the stairway side of the door for a descending distance equal to the width of the door.

Alton Lynch described his wife's fall in these words:

> And as I put my hand up on the door to push it open, I had my hand probably above the flash plate—or buffer plate—the push plate on the inside of the door, which would be the north side of the door. I pushed the door open, I would say at least 45 degrees. * * * Whether or not my wife had her hands on the door, I cannot say for certain, but the door was in the

—open, and by her being ahead of me, I was at a standstill holding the door. She stepped —I believe she stepped with her left foot. She went down; and with one continuous movement as she stepped.* * *

Q. She started to take the step and started falling head long down the steps?

A. It was just in outer space. I didn't have time. Of course, I-had one of-my hands on the door. I don't know for sure which hand I had holding the door open, but she stepped, and she was gone; and I didn't have an opportunity to grab. She was just there- in outer space, you might say, and went down the steps and -hit just once half way to the bottom, half way down those steps, and seemed like the next time she hit it was at the bottom of the steps, the landing.

Appellee's description of the fall on direct examination was very brief. She testified that as they ascended the stairs to the second floor she did not observe the absence of a platform; that she had never before used this particular passageway; that she pushed the door and started to step and "I just fell"; that she started with her left foot but made no contact; that "I just fell and I landed at the bottom of the steps"; and that she had no recollection of catching her heel or slipping on any object.

On cross-examination appellee was questioned at length about her precise movements immediately preceding the fall:

Q. Did you place your left foot on the first step down?

A. I started to—if I—I fell, just like I started to step and fell in a hole.

Q. Mrs. Lynch, did you place your foot on the first step down?

A. I couldn't tell you if it depended on my life.

Q. Did you tell me on August 25 in Mr. Gordon's office, before a court reporter, under oath, that you did step with your left foot on the first step down?

A. Yes. I said that.
    *   *   *

Q. Were you confused at all about that?

A. Yes, I'm confused until this day what caused me to fall.
    *   *   *

Q. I said, 'And you could see a step down? And you put your left foot down one step, is that correct?' And your answer was, 'Yes.' Now, is that your testimony?

A. If it's down there, I said it. But something happened to that first step when I stepped down. I don't—I mentioned I didn't know whether it was a narrow step or what, but something happened with that first step.'
    *   *   *

Q. My question is: Having seen the top step, did you take your left foot, as you said here [discovery], in answer to several questions, did you take your left foot and place it down on that top step and fall?

A. Well, I took a step with my left foot, and I fell, I don't know what happened. I don't know whether I hit the step, or the middle of the step, or where I hit it. I just don't know.

Appllant emphasizes the difference in appellee's statements made on discovery and in her courtroom testimony. The essential difference is apparent. On

discovery she testified that she placed her left foot on the first step down and fell, the cause 'of the fall being unknown to her. At the trial she stated on cross-examination that she did not know whether her foot ever made contact with the first step. The discrepancy was a factor for the jury's consideration in passing on appellee's credibility and in its search for the truth. It creates no ground for our disturbing the verdict. *Magnolia Petroleum Co.* v. *Saunders,* 193 Ark. 1080, 104 S. W. 2d 1062 (1937).

Appellant contends that there is no established connection between the absence of a landing at the head of the stairs and the fall experienced by appellee. It is emphasized that appellee did not know what caused her to fall and hence the conclusion of the jury on that score must rest solely on guesswork.

A safety engineer testified as to the regulatory requirements concerning a landing on the stairway side of the door and level with the corridor on the other side. He described the safety feature of the requirement:

On the stairways, you never know, if you've a door that you can't see through, what's on the other side. When you go through a door the purpose of the landing is to give you room to go out of the door, handle the door, close it. You have room to look at the environment. It is a protection to get you beyond the door.

When one examines the testimony of appellee's husband in the light most favorable to the jury conclusion, we think its finding of causation was reasonable. The jury could well have found from that testimony that appellee stepped into open space. "She went down and with one continuous movement as she stepped." He testified that her first contact with the steps was half way down the stairs. Similarly, on direct examination, appellee insisted that when the door opened she put her left foot forward, made no contact,

and started falling. "I started with my left foot and didn't make contact." From appellee's testimony itself the jury could have concluded that the fall so frustrated her that she actually did not know the details of the incident. Still the jury had the testimony of the only other eyewitness who recounted the incident with apparent clarity. There was also evidence from which the jury could have concluded that appellee was walking at a normal gait, wearing low heels, and did not trip or slip on any object.

Had St. Anthony's hospital conformed to the safety regulation it would have installed a platform extending the width of the door and south a distance also equal to the width of the door. A failure to install the platform was evidence of negligence. The jury simply concluded that a platform of those dimensions would more than likely have prevented appellee from stepping into open space and thus averted the fall. The regulation was designed, according to the engineer, to prevent the very incident that occurred in this instance.

If appellee's evidence afforded a reasonable basis for the conclusion that it was more likely than not that the failure to install the platform was a substantial factor in causing her to fall, then she met her responsibility of proving causation. Prosser, Torts (3rd Ed. 1964), at page 245. Continuing on page 246 the same authority states:

> He [plaintiff] need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. * * * If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.

All of the evidence we have recounted was in

the record when appellant moved for an instructed verdict at the close of plaintiff's case. The only . evidence offered by appellant was a portion of appellee's discovery deposition, which was cumulative because appellee had been cross-examined relative to the same questions and answers. What we have said is equally applicable to both of appellant's motions—the motion for an instructed verdict when appellee rested her case and the same motion at the conclusion of the entire case.

Affirmed.